## CONTINUATION IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Nicholas von Koenig, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1. I make this affidavit in support of an application for a search warrant for information associated with Facebook user ID 100028934132615 ([facebook.com/theron.perry.56](facebook.com/theron.perry.56)), hereafter referred to as the **Target Account**, that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta Platforms, Inc. to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the **Target Account**.

2. I am a Detective with the Berrien County Sheriff's Office and a Task Force Officer with the Federal Bureau of Investigation (FBI). I have been a Deputy with the Berrien County Sheriff's Office since 2010 and have been assigned to the FBI Benton Harbor Safe Streets Task Force since January 2022. I have directed and participated in numerous investigations involving allegations of violations of federal criminal statutes. As part of these investigations, I have applied for and served search

warrants for contents of cellular devices. I have also participated in federal criminal investigations involving allegations of felons in possession of firearms.

3. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically, felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), have been committed by the user of the **Target Account**. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## Probable Cause

4. Since approximately April 2022, FBI Special Agents with the St. Joseph Resident Agency in the Detroit Division, as well as law enforcement officers in multiple jurisdictions throughout Berrien County Michigan, have been investigating Theron PERRY for possessing a firearm as a convicted felon.

### A. Previous Conviction and Supervised Release

5. In 2017, Theron PERRY pleaded guilty to being a felon in possession of firearms in case number 1:17-cr-88 in the Federal District Court for the Western District of Michigan. Chief Judge Jonker sentenced PERRY to 68 months in BOP to be followed by three years of supervised release. PERRY began his supervised release in January 2022.

### B. April 20, 2022 Traffic Stop in Benton Harbor, Michigan.

6. On April 20, 2022, in Benton Harbor, Michigan State Police ("MSP") troopers Jared Orban and Charles Scruggs observed a tan Mercury Sable traveling eastbound on Britain Avenue. As the car passed the troopers, they observed the lone occupant and driver to be a male subject wearing a black ski mask. The troopers

2

conducted a U-turn to follow the car. Shortly after doing so, the car pulled into the driveway of 464 Packard Street and the driver exited the vehicle still wearing the ski mask. The troopers identified the Michigan license plate affixed to the Sable as EMT6618. Upon querying the plate through their system, they learned that license plate was associated with a 1996 GMC Yukon. This was an improper plate, which is a misdemeanor in the state of Michigan.

7. Shortly after arriving at 464 Packard Street, the Sable pulled out of the driveway and parked on the roadway near that residence facing southbound. Troopers approached the vehicle, observed the driver was the man they had seen previously, and activated their emergency lights to initiate a traffic stop. The driver identified himself as Theron PERRY and told the troopers he did not have a valid driver's license. Based on the vehicle being improperly plated and the fact that PERRY was not a valid driver, the troopers requested that the car be towed. During an inventory search of the car, three handgun magazines were located in the center console of the vehicle. Inside a laundry basket full of clothes behind the driver's seat, troopers located a Taurus G3 9mm handgun with a chambered round and an additional 17 rounds inside the affixed magazine.

8. Troopers reviewed PERRY's criminal history and observed he was a convicted felon prohibited from possessing a firearm. PERRY was lodged at the Berrien County Jail for carrying a concealed weapon, felon in possession of a firearm, felon in possession of ammunition, and three counts of felony firearm.

9. As noted above, PERRY was on federal supervised release at the time of this incident. PERRY violated the terms of his supervision by possessing the firearm. United States Probation issued an arrest warrant for PERRY on April 25, 2022. However, PERRY had already been released on bond on April 22, 2022.

10. On May 26, 2022, investigators interviewed Maurice McKenzie, a close friend of PERRY and the owner of the Sable which PERRY was driving during his arrest on April 20, 2022. McKenzie said none of the items inside the Sable belonged to McKenzie. He also said that since PERRY's arrest on April 20, his primary communication method has been Facebook Messenger.

    **C.    May 20, 2022 Traffic Stop in St. Joseph, Michigan.**

11. On May 20, 2022, Trooper Orban was on patrol in St. Joseph, and saw PERRY driving a tan Mercury Mountaineer with Michigan license plate EFD7653, which is registered to Elizabeth Blaylock, a known girlfriend of PERRY. Trooper Orban knew that PERRY was wanted by United States Probation and attempted to execute a traffic stop to arrest PERRY at the Shell gas station located at 2600 Niles Avenue. When Trooper Orban attempted the traffic stop, PERRY fled northbound on Niles Avenue and Trooper Orban did not pursue him.

12. PERRY continued to travel northbound on Niles Avenue at a high rate of speed and struck another vehicle in the 2800 block of Niles Avenue. This caused him to lose control of his vehicle and crash into Flagstar Bank located at 2829 Niles Avenue. PERRY then got out of the vehicle and fled on foot across Niles Avenue where he was finally apprehended by troopers in a McDonald's parking lot at 2820 Niles Avenue.

13. When PERRY was apprehended, a search of his person led to the discovery of **Subject Device 1**. During a subsequent inventory search of the Mountaineer, troopers located **Subject Device 2**. The **Subject Devices** have been stored in the Benton Harbor Department of Public Safety since being seized on May 20, 2022.

### D. Interviews of Elizabeth Blaylock and Victoria Pipkins.

14. On May 25, 2022, Special Agent Ben Glynn and I interviewed Elizabeth Blaylock. Blaylock said that following PERRY's release from Berrien County jail on April 22, 2022, he requested that she purchase him a replacement firearm for the one that was seized during his arrest on April 20. Using money provided to her by PERRY, Blaylock purchased a Taurus G2 handgun and provided it to PERRY on April 27, 2022. Blaylock also said PERRY was dating Victoria Pipkins and that Pipkins had told her that the gun PERRY was originally arrested with was provided to PERRY by an individual who went by "Lil Rob."

15. Following the interview of Blaylock, investigators also interviewed Victoria Pipkins on May 25. Pipkins said PERRY communicated with her using multiple phone numbers associated with multiple physical devices. Two of the phone numbers PERRY used to communicate with Pipkins were (317) 486-3707 and (269) 482-2712. Pipkins described the physical devices used by PERRY as a white phone with a cracked screen, believed to be **Subject Device 1**, and an LG Stylo 6 formerly used by Blaylock, believed to be **Subject Device 2**. Pipkins consented to investigators reviewing her message threads with PERRY. On April 26, 2022 at

5

approximately 3:28 p.m., PERRY, using (317) 486-3707, sent the following message to Pipkins, who has phone number (269) 338-9771:



16.     Based on my training experience and knowledge of the investigation, I believe PERRY was asking Pipkins to lend him $220 for him to provide Blaylock ("Lizz") to purchase a gun for him. Pipkins confirmed this interpretation of the message. However, she said did not provide him the money he requested to purchase the gun.

17.     In addition to the phone numbers mentioned above, Pipkins said she also communicated with PERRY via Facebook Messenger.

E.     **PERRY's Jail Calls After Arrest**

18.    Following PERRY's most recent arrest on May 20, I listened to jail phone calls between PERRY and a female I believe to be Jasmine Perry, sister to Theron PERRY. Jasmine Perry's number is (269) 615-8562. On May 24, 2022, at approximately 6:17 p.m., PERRY called that number and asked the female to go on to his Facebook account and delete his messages, specifically between "Liz" and him. PERRY requested the female delete any pictures, to "screen" the last week's messages before he got "locked up," and to delete messages and pictures.

19.    On a separate call on May 25, 2022, at approximately 5:11 p.m., PERRY called his sister's number and asked her to sign out of his Facebook account and change his password so that only she would know what it was. Also on May 25, 2022, at approximately 8:22 p.m., PERRY called his sister again and asked if law enforcement gave Pipkins a subpoena. She informed him that law enforcement did, and that the officers also took photographs of the message he sent Pipkins regarding his request to borrow money to have Blaylock purchase him a gun. PERRY then told the female "I asked Liz to buy a gun, but she never bought a gun."

20.    Through reviewing publicly available Facebook information, investigators identified the **Target Account** as being used by PERRY. Investigators confirmed the **Target Account** was being used by PERRY due to the Facebook username ("Theron Perry"), the publicly accessible photographs (the majority depicted PERRY himself), and the internet address (facebook.com/theron.perry.56).

21.    Below is a screenshot from PERRY's publicly-viewable Facebook page and a Secretary of State image of PERRY for comparison.

7

 

22.     On April 26, 2022, I submitted a preservation request to Facebook to preserve the contents of the account for future legal process. I renewed that preservation request on or about May 24, 2022.

23.     Based on the foregoing, there is probable cause to believe the **Target Account** may contain evidence of when, how, and from whom Theron PERRY obtained the firearm, and may contain images of firearms possessed by PERRY. I now seek this warrant to search the **Target Account** for evidence of the crimes under investigation.

**Information about Facebook**

24. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

26. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

28. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

29. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook

10

users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

30.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

31.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

32.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

33.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

11

34. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

35. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

36. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

37. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

38. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

39. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the

account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

  40. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

14

## Information to be Searched and Things to be Seized

41. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta Platforms Inc. or "Facebook" to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## Conclusion

42. I respectfully submit there is probable cause to believe that Theron PERRY illegally possessed a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). I also submit that this application supplies probable cause for a search warrant authorizing the examination of the **Target Account** described in Attachment A to seek the items described in Attachment B.

43. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta Platforms Inc. Because the warrant will be served on Meta Platforms Inc, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.